IN THE COURT OF COMMON PLEAS OF YORK COUNTY,
PENNSYLVANIA

COMMONWEALTH                    NO. CP-67-CR-0006753-2005

        VS

SHAHNAWAZ M. MATHIAS         :

                        (Plea)

            York, Pa., Monday, May 15, 2006

        Before Honorable Sheryl Ann Dorney, Judge

APPEARANCES:

        KELLEY L. BREWER, Esquire
        Assistant District Attorney
        For the Commonwealth

        GEORGE MATANGOS, Esquire
        For the Defendant

                    *  *  *

            ATTORNEY BREWER:  This is the
Commonwealth versus Shahnawaz Mathias, Case 6753 CA
2005, charges of two counts of indecent assault,
corruption of minors, selling, furnishing liquors to
minor, and unlawful contact or communication with minor.
This is the time scheduled for trial in this matter.
The Defendant is present with Attorney Matangos, and the
Commonwealth is ready to proceed.

            THE COURT:  Defendant's ready to proceed,
Attorney Matangos?

            ATTORNEY MATANGOS:  First of all, Judge,
thank you for your indulgence.

                        1

EXHIBIT A

We received two statements just before
1:30 this afternoon, one purporting to be the interview
of my client on the 21st of September of 2005, and
another being purported to be the statement prepared I
believe by the victim on her own computer and then faxed
to the police department.  So I've had some material I
needed to obviously review with my client.  So I
appreciate the Court's willingness to allow us to do
that.

Having said that, if I could just have
the prosecutor's ear for a moment.

Judge, I believe we have a plea agreement
that's satisfactory to the Commonwealth and the
Defendant at this point.

THE COURT:  Has your client completed a
guilty plea colloquy?

ATTORNEY MATANGOS:  Have not.

THE COURT:  Why don't you take the time
to do that.  I'll get ahold of Mr. Kope and see what
he's up to.

(A recess was taken from this case.)

ATTORNEY BREWER:  This is the matter of
Commonwealth versus Shahnawaz Mathias, Case No. 6753 CA
2005, charges of two counts indecent assault, corruption
of minors, selling, furnishing liquor to minors, and
unlawful contact with a minor.  This is the time
scheduled for trial.  The Defendant is present with
Attorney Matangos and is prepared to enter pleas of
guilty to Count 1, indecent assault without consent, and
Count 5, unlawful contact, communication with a minor.

The agreement is for five years
probation, costs of prosecution, no contact with the
victim, and sentencing will need to be deferred, Your
Honor, as the unlawful contact carries the ten-year
registration and assessment will be necessary.  And the
remaining counts will be nol prossed.

THE COURT:  Okay.  Attorney Matangos, is
that a correct statement of the plea agreement?

ATTORNEY MATANGOS:  It is, Judge.

2

THE COURT: Mr. Mathias, do you accept that plea bargain?

THE DEFENDANT: Yes, I do.

THE COURT: Did you complete and do you understand all of your rights in this guilty plea colloquy?

THE DEFENDANT: Yes.

THE COURT: Were there any you did not understand?

THE DEFENDANT: No, Your Honor.

THE COURT: Are the answers to the questions and the information you provided true and correct?

THE DEFENDANT: They're correct.

ATTORNEY MATANGOS: And just for the record, Judge, I filled out the responses as I spoke to Mr. Mathias here in open court, went over each question individually, made sure he understood its contents, then I filled the answer in with his approval. He initialed the bottom of each page and did sign.

THE COURT: Is that correct, Mr. Mathias?

THE DEFENDANT: That's correct.

THE COURT: Count 1 charges you with indecent assault. That information alleges that on July 23, 2005 you had indecent contact with a minor who was born on May 28, 1989, whose initials are R.F. and you did so without her consent, thereby comitting the offense of indecent assault. That's a misdemeanor of the second degree. Do you admit doing that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Count No. 5 charges unlawful contact or communication with a minor. That information alleges that on July 23, 2005, you knowing that R.F. was a minor, intentionally contacted or communicated with her for the purpose of engaging in prohibitive activity under Chapter 31 of the Pennsylvania Crimes Code, which I'm not sure what prohibited activity, but, Attorney

3

Brewer, you want to tell me what that allegation is all about?

ATTORNEY BREWER: Chapter 31 is the sexual offenses and that relates to his having direct contact with her for the purpose of engaging in the indecent assault.

THE COURT: So that's what you are charged with, Mr. Mathias, having contact with R.F. for the purpose of engaging in indecent assault, thereby committing the offense of unlawful contact or communication with a minor, a misdemeanor of the first degree. Do you admit doing that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Tell me who R.F. is and tell me what happened on this particular day. I read the police statement, which is the affidavit of probable cause, and the complaint. But you tell me in your words what happened.

(The Defendant conferred with his attorney.)

ATTORNEY MATANGOS: Your Honor, I've raised this with the prosecution. There is an issue with the date. We don't dispute that the incident occurred this July 23 date, however, it raises an issue with Mr. Mathias. There obviously was other -- another time. But, as Mr. Mathias obviously has told this Court at that time, and, in fact, we had alibi witnesses to put him England at the time, however, he did give a statement indicating that the incidents occurred.

What he is asking me is do I have to say it was July 23.

THE COURT: No, it doesn't. It is not fatal to the prosecution, Mr. Mathias, that a wrong date may have been used. It is not fatal to the prosecution.

Many times what happens if there is an incident with a -- let's say a child who is too young to remember the date. They'll sometimes say between June 2005 and December 2005, sometime in there. So that is not fatal to the prosecution.

THE DEFENDANT: Okay.

4

THE COURT:  Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  At some point in time it is alleged by the Commonwealth, July 23, obviously you are saying it was a different date, did you commit these offenses?

THE DEFENDANT:  Yes.

THE COURT:  Tell me what happened.

R.F. is who?  As I understand it, she is a friend of your daughter's?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Tell me what happened.

I know it's difficult for you to do that, especially with respect to this particular girl because she was a friend of your daughter's, but I need to have a factual basis on the record before I can accept your plea, Mr. Mathias.

THE DEFENDANT:  My daughter wanted to have a party at my house and she asked for beer.  And our family doesn't drink, neither do I.

THE COURT:  How old is your daughter?

THE DEFENDANT:  17.

THE COURT:  She was 17 at the time she asked for beer?

THE DEFENDANT:  Yeah.  16, sorry.

THE COURT:  16.  What happened?

THE DEFENDANT:  I was in the office and she slipped a note to me asking for that and I said no. I was on the phone.  The complaint said it was Saturday, but I'm not in the office on Saturdays.  Friday sometime.

Then later in the evening I didn't go home, but since I travel a lot, other people watching my

5

house, and prior to that there was a party at my house, which I wasn't aware of.

THE COURT:   Your daughter had a party?

THE DEFENDANT:   I don't know.   But there was other girls who clean my house.   They work for me cleaning the house.

Apparently there was a party at my house and there was -- my daughter called up that party, she just went up to the house and apparently the house was trashed and the beer was there already, which I wasn't aware of because I was traveling for one month.   And I came home -- they had this party, and apparently there was beer in the house in the cellar.

THE COURT:   You didn't get beer for them?

THE DEFENDANT:   No.

What I did get is the nonalcohol beer because I drink nonalcohol wine every now and then. That was the extent of the beer thing, you know.   I came close to

ATTORNEY MATANGOS:   If I could just have a second.

(The Defendant conferred with his attorney.)

THE DEFENDANT:   Well, when I came it was, like, 10:30, close to 11 o'clock at night when I came home.   My daughter was at the house with her friends already.   And Rachel, she ran up to me asking a question about my cars.   I have a lot of expensive cars.   And then I ran in the house and they were already downstairs drinking.

What I had was nonalcohol beer, which I brought in and then I just babysat them.   And I think Rachel came upstairs to my house -- to the main part of the house from the basement.   I was working and she wanted -- she looked at the car.   Some of my friends had gone shopping that day, and then they had a bag of Victoria's Secret, some of their garments, and I think Rachel went for them.

And then the girls came off where they

6

work, they work at some restaurant. When they got off
they came to pick their belongings and some of the stuff
was missing. It was Victoria's secret underwear and
stuff. So I said I don't know, ask Rachel. And in
between the time she came up to the car Rachel said that
I touched her and tried.

THE COURT:  What do you say you did?

THE DEFENDANT:  I beg your pardon.

THE COURT:  What do you say you did?  I
don't want to hear what Rachel said, I want to hear what
you did.

THE DEFENDANT:  I kissed her.

THE COURT:  You kissed her?

THE DEFENDANT:  Yes, sir.

THE COURT:  What else did you do?

THE DEFENDANT:  I embraced her.

THE COURT:  What else did you do?

Mr. Mathias, I'm not playing games.  In a
minute I am going to get a jury and let the jury decide.

THE DEFENDANT:  I kissed her on the
cheek, I embraced her.  And she said I touched her, too.

THE COURT:  What did you do?  I don't
want to hear what she said, I want to hear what you did,
what you admit to doing, Mr. Mathias.

THE DEFENDANT:  I don't know what part is
inappropriate to touch, but I touched her.

THE COURT:  Where did you touch her?

THE DEFENDANT:  I was like this to her,
Your Honor.  And I kissed her on the cheek and my hand
was on her leg.

THE COURT:  The affidavit says your hand
went up her shorts to her vaginal area, she pushed you,
tried to get away, and she hollered --

-7-

ATTORNEY MATANGOS:  It does say upper thigh, Judge.

THE COURT:  Upper thigh?

ATTORNEY MATANGOS:  Because that's one of the questions I was concerned about at the preliminary hearing.

THE COURT:  Okay.  It says that you then pulled her in front of you and both of your hands were on her buttocks.  You then moved your hand towards the front and placed it up inside the victim's shorts through one of the pant legs towards her vaginal area.  She yelled at you to get off and you stopped.

Now, did you do that or didn't you do that?  Then she says he told me he was sorry but that I was just too sexy.  Not me, of course, Rachel.

THE DEFENDANT:  Your Honor, I did touch her the way I described to her.

THE COURT:  Did you touch her in the way this says?

THE DEFENDANT:  I agreed to the charge the way it is being said.  I can't tell the difference between touching the buttocks or inner thigh if it would make any difference.  I told you that I

THE COURT:  Where do you come from?  You don't take a minor child and touch a minor child and pull her towards you by the buttocks.  You don't do that.  Not in Pennsylvania.

ATTORNEY MATANGOS:  Judge, what Mr. Mathias is saying is he did obviously inappropriately touch her.  We're pleading guilty to indecent assault.  But we're not agreeing with every single fact of the affidavit.

THE COURT:  I understand that, Mr. Matangos, and I want to hear from him what he did.  He doesn't know the difference between touching a minor child on the buttocks, that being inappropriate.  He doesn't know that's inappropriate?

ATTORNEY MATANGOS:  He doesn't -- he's indicated to me he did not do those things, but if you

8

look -- if I were to put her next to him the way he
wrapped his hand around me, she would certainly assume
that's where it was, although he was giving what he
thought -- they had done it many times before. They
were friendly with each other before that, Judge. This
was clearly a violation. He understands that the law
does not allow that kind of touching.

THE COURT:  Did he put his hand up her
shorts towards her vaginal area?  There is a difference
between putting a hand on the thigh --

I was born at night Mr. Mathias, but I
wasn't born last night.  I know the difference between
putting a hand on the thigh and reaching up towards your
vaginal area.

THE DEFENDANT:  I didn't reach her
vaginal area, Your Honor.

THE COURT:  You did.

THE DEFENDANT:  I did not.

THE COURT:  You didn't put your hand
towards her vaginal area?

THE DEFENDANT:  No, Your Honor, I did
not.  I told you exactly how I embraced my attorney just
now.  That's what I did.

THE COURT:  You put your hand on her
thigh?

THE DEFENDANT:  Yes.

THE COURT:  Up her pant leg?

THE DEFENDANT:  Right.

THE COURT:  What the heck would you do
that for to a minor child?  Why would you put your hand
up the shorts pant leg of a minor child?

ATTORNEY MATANGOS:  Judge --

THE COURT:  No, I don't -- why would you
do that?

THE DEFENDANT:  Maybe I'm not explaining

-9-

P246

it right.

ATTORNEY MATANGOS:  I've had much more time with Mr. Mathias.  I wasn't trying to interrupt the Court, Judge.  I am just trying to indicate it is one of the reasons I read the colloquy form to him to make sure I pronounced each and every thing correctly.  There is sometimes a communication issue.

He has not indicated to me -- when I asked him what he wanted to do, he did not question the touching of her thigh.  And the way he presented himself was without her consent that night.

The problem I think I'm having, Judge, with the particular responses that Mr. Mathias is trying to give the Court is that there is some concern on his part about what the Court views him as.  And I am concerned about his answers to questions that obviously point to guilt.  He's indicated his guilt, Judge, and all I'm trying to say is there is an issue with how he's trying to come across and explain it to the Court.

THE COURT:  He says they did it all the time.  They did it many times.

ATTORNEY MATANGOS:  I said that about the hugging.  That was me.  He didn't say that.

THE COURT:  He said it.

There is nothing wrong with hugging a minor child.  But when you do it with some kind of sexual ideation in your mind, by grabbing her around the waist or the buttocks or whatever and pulling her close to you and kissing her on the cheek --

THE DEFENDANT:  Your Honor --

THE COURT:  No.  Let him talk.

THE DEFENDANT:  Your Honor, I didn't know how she was taking it.  It wasn't the first time.  She always embraced me.  She always had.  And it wasn't anything sexual from my side towards her.

THE COURT:  Is that her back there?  Is that Rachel sitting back there?

ATTORNEY BREWER:  Yes, it is, Your Honor.

10

THE COURT:   Come on up and stand by
Attorney Brewer.   Because she is dumbfounded by this.

ATTORNEY MATANGOS:   Judge, I --

THE COURT:   No.   Your name?

THE VICTIM:   Rachel.

THE COURT:   Rachel what?

THE VICTIM:   Fabie.

THE COURT:   Tell me what happened on this
occasion.   F-A-B-I-E?

THE VICTIM:   Mm-hmm.   From the very
beginning?

THE COURT:   Mm-hmm.

THE VICTIM:   Sarah and I were with
friends and she had wanted -- she wanted to have a party
at her dad's house.   So she wrote a letter to him
because her little brother was around and she didn't
want to say it outloud.   And she had asked him, you
know, for beer in the letter and he said okay, but don't
tell your mother or your brother.   And he said when you
come home it'll be downstairs for you.   So we got there,
all of us got there, and beer was downstairs, and there
was some comments made, some touching that happened,
and

THE COURT:   Between who?

THE VICTIM:   Sean and I.

ATTORNEY BREWER:   Go ahead and tell her
about that.

THE VICTIM:   When we first got there we
were all just kind of making our way from the driveway
to, you know, down stairs in the basement, and I had
made a comment about his cars.   I said jokingly I wish
you could buy me a car like this.   And what did he say?
I wrote it down.   If you would sleep with me I'd get you
a car like that.

And then I just went downstairs, we were

11

all just kind of hanging out. I came upstairs for a drink and he said I have something for you. That's when he took me out through the garage, it was pitch dark, and the first thing I said when I walked into the garage was oh my gosh, where are the lights. And he --- that's when he had come from behind me, put his arms on my butt, and started making his way in between my thighs and up my shorts.

Now, he did not touch any part of my vaginal area.

THE COURT: Was it inside your thighs he was --

THE DEFENDANT: Yes.

THE COURT: Not just on your thighs?

THE VICTIM: Yes. And he kissed my cheek and I said no, stop. And he said I'm sorry, you're just too sexy.

And I went outside and he offered -- he said, you know, I bought you some stuff today, and there was a Victoria's Secret bag in the back of his car and he had handed me some underwear and was like do you like these, and I didn't accept anything. I was uncomfortable at this point and I tried to get myself out of it. So I said I'm going to run out to the car.

And I just kind of waited out by the car to see -- waited until he went inside, and I went and told Sarah right away. I said, you know, I told her exactly what happened and she said well, it's happened to somebody before, let's go -- we have to tell my mom.

And I'm not sure, you know, from that point on other comments were made when we were downstairs. He had talked about getting a hot tub and saying he would have all of his girlfriends over and we could all be naked and he goes Rachel, you're invited.

And as far as comments and gestures that were made --

THE COURT: Had you and he -- had he hugged you like that many times before?

THE VICTIM: When I would come over to

12

the house it would be hi, it's nice to see you.

THE COURT:   What was different about this hug and the other hugs?

THE VICTIM:   The fact his hands were on my butt and he was kissing me and he had moved between my thighs.

THE COURT:   Thanks, Rachel.

You heard her.  Did you do the things she said?

THE DEFENDANT:   I plead to --

THE COURT:   Listen.

THE DEFENDANT:   Yes, I heard.

THE COURT:   I heard.  Did you do the things she said you did?

THE DEFENDANT:   Yes.

THE COURT:   We accept the pleas of guilty to Count 1, indecent assault, and Count 5, unlawful contact or communication with minor.

We defer sentencing until Monday, August 14, 2006 at 2:30 p.m., at which time the Defendant shall return for sentencing purposes.  We direct that he not have any contact directly or indirectly with the minor by the name of R.F., which is the victim in this case; and we direct that he cooperate with the Pennsylvania Sexual Offender Assessment Board for an evaluation so that we can -- so the District Attorney's Office can have that report prior to sentencing.

Pending sentencing the Defendant may continue on his current bail.

*   *   *

ank
6/2/06

13